| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | | SOUTHERN DISTRICT OF TEXAS |

LegacyRG, Inc., § § § Plaintiff, § § versus § Civil Action H-14-1574 § § Chris Harter, § § § Defendant. §

# Opinion on Summary Judgment

1.     *Introduction.*

For five years, Chris Harter was president of LegacyRG. After he left the company, Legacy discovered he had stolen money through its payroll system. Legacy sues to recover the money Harter stole as well as the money he received as part of his resignation. LegacyRG will recover what it is owed.

2.     *Background.*

Niel Morgan is the sole shareholder, director and former president of Legacy. Legacy managed two Houston restaurants, the Original Ninfa's and Antone's. In the fall of 2006, Morgan hired Chris Harter to be president and chief executive. Under the employment contract, Harter's salary would be $275,000. In 2011, Harter resigned from the company.

Harter directly managed the payroll until a third party was hired in early 2011. His salary was paid fortnightly. He had the ability to change his salary in the payroll system in the computer. While he was with the company, Legacy says that he raised his salary surreptitiously, paying himself an additional $123,557.58.

Between March 13, 2009, and December 30, 2010, Harter stole by inflating his paychecks and taking extraneous payments. In 2009, he increased checks by $961.54 on two occasions and by $3,846.16 on four occasions. In 2010, he generated checks that had been increased by $3,846.16 on seven occasions. During the same period, he also authorized eight extraneous payments to himself, ranging from $5,288.46 to $10,576.92.

Although Legacy lent Harter money throughout his employment, the loans were separately documented in Legacy's records and expressly approved by Morgan. Harter knew that he did not have the authority to casually take the additional money. When he wanted the loans, he asked Morgan and recorded them properly. The excess salary was wholly-unrelated to the loans. The documents detailing Harter's payroll alterations – proper and improper – were under his control as part of his presidential duties.

As part of his resignation, Legacy and Harter entered a separation agreement. Under it, Legacy paid Harter a cash bonus, bought his shares in Original Ninfa's and Antone's, and forgave loans Morgan had authorized. Net of the shares he received, the consideration paid to Harter in the agreement was $225,365.23. The agreement was contingent on Harter's returning all of Legacy's property when he left.

3.  Contract.

A contract is binding so long as each party's commitment is clear.[1] Both parties must agree on the contract's essential terms for it to be enforceable.[2] Harter says that the agreement about his employment was not binding.

The term of the initial contract Harter and Legacy signed expired in 2007. After this, no alternative was executed. The parties continued to abide by the original contract's terms – it bound them for the next four years.

The contract says that Harter will be the president of Legacy for a salary of $275,000. Even though Harter says that it was intended to be non-binding, each party's promise is clear. The contract also says that the salary and termination clauses are fully binding, regardless of his acceptance of the rest of the contract. After it was signed, both sides adhered to its terms.

Parties can also be bound by an implied contract if someone performs an employee's duties with the employer's approval.[3] Harter acted as president and Legacy paid him for his efforts. Whether it was the written contract or an implied one, Legacy was bound to pay Harter,

---

[1] Bendalin v. Delgado, 406 S.W.2d 897, 899 (Tex. 1966).

[2] T.O. Stanley Boot Co., Inc. v. Bank of El Paso, 847 S.W.2d 218, 221 (Tex. 1992).

[3] Hamm v. Drew, 18 S.W. 434, 436 (Tex. 1892); Mo., Kan. & Tex. Ry. Co. of Tex. v. Reasor, 68 S.W. 332, 333 (Tex. Civ. App. 1902, writ ref'd).

and he was bound to faithfully perform. As both parties performed under the contract, Harter breached it when he changed his salary in Legacy's payroll system to steal.

4.   *Fiduciary Duty.*

A corporate officer is a fiduciary to its corporation.[4] A president is a fiduciary because he is a corporate officer. Harter says he was not a fiduciary to Legacy because Morgan was really still the president, and he was "not duly elected, appointed, or designated" by Legacy's board. Of course, a fiduciary can be created by an informal relationship of trust as well as a contract. A person has a fiduciary duty if his position requires trust and confidence from another.[5] He would have had the same responsibility to Legacy if, instead of the president, he were one or ten vice presidents.

In plain language, the employment contract says that Harter is the president and Morgan is the shareholder and director. Harter acted as president by conducting Legacy's business, managing its restaurants, and overseeing its payroll. Harter had his business cards and letterhead printed to show that he was president. His LinkedIn profile says that he was president from 2006 until 2011.

Morgan may have signed some tax forms during Harter's presidency, but this minor variation does not eviscerate the four years of Harter having been the chief executive of Legacy in all other respects. Harter operated the company and controlled its disbursements as president. Morgan did not.

Further, Harter cannot deny his authority because he was never "elected" by the board. The sole director signed the contract. Legacy entered the contract, committing to the terms. Harter acted and represented himself as president, showing he accepted the position and the responsibilities that came with it. The absence of a coronation does not matter – both parties agreed.

---

[4] Tenison v. Patton, 67 S.W. 92, 94 (Tex. 1902); Paddock v. Siemoneit, 218 S.W.2d 428, 431 (Tex. 1949).

[5] Kinzbach Tool Co. v. Corbett-Wallace Corp., 160 S.W.2d 509, 512 (1942).

With Harter's presidency came power, responsibility, and a duty to Legacy. This duty required him to act in the best interest of the company – not to misuse his power for irregular personal benefit. He accepted the title and accepted responsibility.

5.  *Limitations.*

An action for fraud must be brought within four years. Legacy sued on June 6, 2014. The latest date a viable claim may have accrued is June 6, 2010. Harter made twenty unauthorized payments during his employment at Legacy. Seventeen payments were before June 6, 2010, and three after. Because fraud is not in its nature obvious, a claim for it accrues at the time of discovery rather than the time of injury, within reason.[6]

Harter says that Legacy should have discovered his defalcation because it had access to the records. Legacy says that its injury was not reasonably discoverable because it had no reason to believe that Harter was stealing or doing anything else irregular that would have alerted it to his malfeasance.

Although Legacy had access to the records of Harter's embezzlement, no indication of misconduct prompted Legacy to investigate. During the time that Harter was altering the payroll, he was in charge of all records which would have revealed his theft. Since all payroll documents were his responsibility, and Legacy had no reason to suspect he was stealing, it's injury was not discoverable like Harter says it was. The discovery rule applies.

Harter says that Legacy was aware of his receiving excess salary on June 20, 2010. Under this rule, none of the twenty payments is barred because the suit was brought within four years of when Legacy discovered the defalcation.

Even if the claim accrued when Harter stole the money, Harter's role as fiduciary allows Legacy to recover all improper payments.[7] It does not matter that seventeen payments occurred over four years before the claim.

6.  *Fraud.*

---

[6] Kuhlman v. Baker, 50 Tex. 630, 636 (1879).

[7] Kinzbach, 138 Tex. at 573-74.

Harter says that misrepresenting his salary did not defraud Legacy. Harter changed his salary to take money that he had not earned, but he says that Legacy had access to the records. It does not matter that he kept accurate records of the money he took – the issue is the underlying thefts. Twenty entries in five years of multiple restaurants' account records is not obvious.

Legacy relied on his misrepresentation that the records reflected Legacy's business properly. Even a review of the records would not have necessarily alerted Legacy to Harter's malfeasance. Listing a theft as an ordinary payroll expense is not consistent with candor or GAAP.

Actual knowledge of misconduct and access to records of misconduct are not the same. Knowledge of the company's records does not mean Legacy ratified Harter's contract as there must be clear intent for ratification. Legacy trusted Harter as president, and relied on the information that he presented to it.

7.  *Separation Agreement.*

Harter received net consideration of $224,365.23 under the separation agreement. It was contingent on his returning all of Legacy's property. He says that he did not violate the agreement because money is not property.

Property goes beyond Harter's narrow interpretation and encompasses everything of value related to Legacy's business. The money is property in the sense that it is an asset – a chose in action or bundle of cash. Harter had no title to the additional $123,557.58; Legacy does. Harter had to return that money under the terms of the separation agreement, and he did not. This breached the agreement. His secrecy does not entitle him to free money.



8. *Conclusion.*

The employment contract was binding, and Harter breached it when he altered the payroll to collect money extraneous to his salary. As president, Harter was a fiduciary to Legacy, and he breached his duty when he manipulated the payroll system to steal $123,557.58. Legacy had no reason to suspect malfeasance, so the claim accrued when Legacy discovered the defalcation on June 20, 2010. When he resigned, Harter received $224,365.23 under the separation agreement in excess of the value of the stock he transferred to Legacy. He breached this agreement by not returning the stolen funds when he left Legacy. Legacy will collect the purloined funds and net consideration gained from the separation agreement – a total of $347,922.81.

Signed on August 20, 2015, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge